Cite as 2022 Ark. App. 215

# ARKANSAS COURT OF APPEALS
DIVISIONS II & IV
No. CV-20-610

| | |
|---|---|
| PETIT JEAN ELECTRIC COOPERATIVE CORPORATION; ARKANSAS ELECTRIC COOPERATIVE CORPORATION; AND SCENIC HILL SOLAR, LLC | Opinion Delivered May 11, 2022 |
| APPELLANTS | APPEAL FROM THE ARKANSAS PUBLIC SERVICE COMMISSION |
| V. | [NO. 16-027-R] |
| ARKANSAS PUBLIC SERVICE COMMISSION; ARKANSAS ADVANCED ENERGY ASSOCIATION, INC.; ARKANSAS ELECTRIC ENERGY CONSUMERS, INC.; NATIONAL AUDUBON SOCIETY, INC.; AND SIERRA CLUB | AFFIRMED IN PART; REVERSED IN PART |
| APPELLEES | |

## PHILLIP T. WHITEAKER, Judge

Separate appellee Arkansas Public Service Commission (the Commission) entered a detailed order[1] setting the rate structure that electric utilities must use to credit their net-metering customers, finding that all net-metering customers should be credited at the full retail rate—the same rate that the electric utilities charge them (and other utility customers) for the grid power that they consume. The Arkansas Electric Cooperative Corporation (AECC), Petit Jean Electric Cooperative Corporation (Petit Jean), and Scenic Hill Solar

---

[1]Order No. 28 entered by the Commission was over five hundred pages in length.

(Scenic Hill) each separately appealed the Commission's order, and we granted the Commission's motion to consolidate their cases here.

Each appellant presents multiple arguments on appeal. AECC challenges the sufficiency of the evidence regarding the Commission's rate-structure decision on several fronts. Petit Jean argues that the Commission's orders should be reversed because the chairman of the Commission, Ted Thomas, allegedly engaged in injudicious conduct, including witness intimidation. Scenic Hill joins three additional parties, the Arkansas Advanced Energy Association, the National Audubon Society, and the Sierra Club (collectively the joint appellees), filing briefs defending the Commission against AECC's and Petit Jean's challenges. Scenic Hill, however, argues in its appeal that the Commission exceeded its statutory authority in other respects. We affirm in part and reverse in part.

I. *Legislative and Procedural History*

A. Net Metering

We begin with an overview of the topic of net-metering. Net metering is a method of billing electric-utility customers who consume electrical power generated by their own renewable-energy equipment (such as wind turbines or solar panels) as well as power supplied by an electric utility. Net-metering customers may generate more electrical power by their own renewable-energy equipment than the customer consumes. In this event, the net-metering customer transmits the excess renewable energy to the electric utility's grid, where it is consumed by other customers (whether or not they also have net-metering equipment). At the end of the electric utility's billing period, the net-metering customer is billed for the

kilowatt hours (kWh) of grid power that the customer consumed and credited for the kWh of any excess renewable energy that the customer supplied to the grid. The rate at which the net-metering customer is credited for the kWh of excess renewable energy supplied to the grid has created much debate and lies at the heart of the issues in this appeal.

## B. AREDA

Like many states, Arkansas has addressed this debate through legislation. In 2001, the General Assembly enacted the Arkansas Renewable Energy Development Act (AREDA). 2001 Ark. Acts 7746. In passing the AREDA, the General Assembly made some key legislative findings. It found that increasing the consumption of renewable resources (1) promotes the wise use of Arkansas's natural-energy resources; (2) increases Arkansas's use of indigenous energy fuels while reducing dependence on imported fossil fuels; (3) fosters investments in emerging renewable technologies to stimulate economic development and job creation in the state; (4) reduces environmental stresses from energy production; and (5) provides greater consumer choices. The General Assembly further found that "net energy metering encourages the use of renewable energy resources and renewable energy technologies by reducing utility interconnection and administrative costs for small consumers of electricity" and that "net-metering would help to . . . attract energy-technology manufacturers, to provide a foothold for these technologies in the Arkansas economy, and to make it easier for customer access to these technologies." *Id*. at 7746–47.

For purposes of this opinion, the AREDA set the framework for net metering within the state of Arkansas. First, it defined a "net metering facility" as "a facility for the production

3

of electrical energy that uses solar, wind, hydroelectric, geothermal, or biomass resources to generate electricity" and "has a generating capacity of not more than twenty-five (25) kilowatts for residential or one hundred (100) kilowatts for commercial or agricultural use." *Id.* at 7747–48. [2] Second, for any net-metering facility at or below the statutory generating capacities, the AREDA provided that electric utilities "shall" allow those facilities to be interconnected to the grid "using a standard meter capable of registering the flow of electricity in two directions." *Id.* at 7748. Third, the AREDA allowed net-metering facilities above the statutory generating capacities to be interconnected to the grid with the approval of the Commission. *Id.* at 7748. Finally, the AREDA also required the Commission to

> establish appropriate rates, terms, and conditions for net-metering contracts, including a requirement that metering equipment be installed to both accurately measure the electricity supplied by the electric utility to each net-metering customer and also to accurately measure the electricity generated by each net-metering customer that is fed back to the electric utility over the applicable billing period.

*Id.* at 7748.

In response to the requirements of the AREDA, the Commission promulgated its Net-Metering Rules (NMRs) in 2002. In NMR 2.04, the Commission instituted a rate structure directing that net-metering customers would be credited for excess energy at the same rate that they paid for the grid power that they consumed. Arkansas Public Service

---

[2]In 2007, the General Assembly changed the definition of "net-metering facility" to raise the generating capacity limit for nonresidential uses. After the amendment, a "net-metering facility" was one that had "a generating capacity of not more than twenty-five kilowatts (25 kW) for residential use or three hundred kilowatts (300 kW) for any other use." 2007 Ark. Acts 5321, 5322.

Commission Net Metering Rules § 2, rule 2.04, available at www.sos.arkansas.gov/uploads/rulesRegs/Arkansas%20Register/2007/dec_2007/126.03. 07-006.pdf. This rate structure is commonly called "1:1 compensation" by the Commission and is commonly called the "full retail rate" by the Arkansas Electric Cooperative.[3]

The electric-utility providers disfavored utilizing the full retail rate. They claimed that paying the full retail rate to net-metering customers prevented them from recovering their costs of serving those customers. In particular, the electric utilities alleged that net-metering customers effectively were not paying their share of service costs, such as transmission and distribution, because the utilities were required to give them an equal credit for such service costs under the full retail rate. The electric utilities were concerned that their failure to recover all of their costs from net-metering customers would lead to "cost shifting," in which the utilities' costs of serving net-metering customers would be unreasonably shifted to their non-net-metering customers. Despite these concerns, NMR 2.04 remained the net-metering rate structure for more than a decade.

C. Act 827 of 2015

In 2015, the General Assembly amended the AREDA in Act 827 of 2015. *See* 2015 Ark. Acts. 3133; Ark. Code Ann. § 23-18-604 (Repl. 2015) (superseded). Act 827 addressed the issue of cost shifting. Generally, the General Assembly required the Commission to establish a net-metering rate structure that accounted for both the costs of providing service

---

[3]We use them interchangeably in this opinion.

and the cost-saving benefits of using renewable energy. Specifically, Act 827 provided that the Arkansas Public Service Commission must establish net-metering rates that included "a requirement that the rates charged to each net-metering customer recover the electric utility's entire cost of providing service to each net-metering customer" and provided that those costs could include "any quantifiable additional cost" associated with the net-metering customer's use of the "capacity, distribution system, or transmission system," *but* "net of any *quantifiable benefits* associated with the interconnection with and providing service to the net-metering customer." Ark. Code Ann. § 23-18-604(b)(1)(A)(ii) (Repl. 2015) (superseded) (emphasis added).

In light of the new provisions in Act 827, the Commission began to revise its NMRs in a new "rulemaking docket," No. 16-027-R. In Phase 2 of this docket,[4] the Commission focused on rate structure to determine "how much credit a net-metering customer receives for net excess generation fed back to the electric utility."

In proceedings before the Commission, AECC and other electric utilities argued that Act 827 mandated that the Commission discontinue 1:1 compensation for net-metering customers and adopt a rate structure that included "two-channel billing" in which net-metering customers were credited for an amount that was equal to the electric utilities'

---

[4]This rule-making docket eventually becomes the focus of this appeal, as will be more fully developed later in this opinion.

"avoided costs.'"[5] Alternatively, the electric utilities argued that net-metering customers could pay their share of maintaining the grid through a monthly grid charge.

Proponents of net-metering disagreed. They contended that Act 827 left the Commission with the discretion to retain 1:1 compensation and argued that the long-term benefits of renewable energy warranted doing so. They argued further that the low percentage of net-metering facilities in Arkansas (called the penetration rate) prevented an accurate assessment of the costs and benefits of net metering. Consequently, they recommended that the existing rate structure (with 1:1 compensation) should remain. Before the Commission could issue a final order setting a rate structure pursuant to Act 827 of 2015, the General Assembly amended the AREDA again.

## D. Act 464 of 2019

In 2019, the General Assembly again amended the AREDA in Act 464. For purpose of the issues raised in this appeal, Act 464 has four significant components. First, it clarified that the Commission has the discretion to retain 1:1 compensation for smaller net-metering facilities. Second, Act 464 allows the Commission to adopt alternative (or additional) rate structures for those facilities, including two-channel billing or grid charges, provided that they neither conflicted with the public interest nor resulted in unreasonable cost shifting. Third, Act 464 contains first-time provisions that expressly allow the grandfathering of net-metering facilities in the event of a future change in rate structure. Finally, the new law raised

---

[5]The utility providers' avoided costs, in shorthand, included the cost of electricity that they otherwise would have had to generate themselves or purchase on the wholesale market.

7

the threshold size of net-metering facilities—from 300 kW to 1,000 kW—that are exempt from seeking Commission approval before they are interconnected with an electric utility.

After the passage of Act 464, the Commission began a new phase of the rulemaking docket. In these new proceedings, the Commission opined that "a number of provisions in Act 464 appear to be either non-controversial or are not subject to debate," such as "third-party leasing of net-metering facilities" and the changes to "the threshold size of net-metering facilities that are exempted from compliance filings with the Commission from 300 kW to 1,000 kW." The Commission, however, recognized that Act 464 created "new rate-structure options" and opined that "the General Assembly left entirely to the Commission the decision to choose one of the various options set forth in [Act 464] or a hybrid thereof." Consequently, the Commission opened Phase 3, a new phase of the rulemaking docket, to take additional testimony and comment concerning issues involving rate structure as set forth by this legislation. The Commission further ordered its General Staff to reconvene a "Net Metering Working Group" (NMWG) consisting of the Commission's General Staff, electric utilities, and other stakeholders, to "explore whether the parties can converge on an agreement for rate structure and other amendments to the NMRs." The NMWG failed to reach an agreement for rate structure and other amendments to the NMRs before July 24, 2019, the effective date of Act 464.

As a result of this impasse, the General Staff of the Commission filed a "Motion to Implement Act 464 of 2019, to Modify Net Metering Tariffs, and for an Expedited Schedule." In the motion, the General Staff reported that the NMWG had been unable to

8

reach any agreement on revised net-metering rules; that there had been "unwarranted delays in both accepting and processing interconnection requests"; and that "certain jurisdictional utilities have expressed that they will delay the implementation of Act 464's public policy by only acting in accordance with their existing tariffs or the [still not revised] NMRs." The General Staff further alleged that certain utilities were unwilling to go forward with 1:1 compensation or comply with the several "blackletter" provisions of Act 464 "that appear to be either non-controversial or not subject to debate." Consequently, the General Staff recommended that "the black letter changes required by Act 464 should be incorporated into existing tariffs by the Commission without delay" because "[a]ny further delay in the incorporation of Act 464 into existing tariffs will frustrate the intent of the General Assembly." To that end, the General Staff's motion included a proposed net-metering tariff that complied with the black-letter provisions in Act 464.[6]

The Commission agreed with the General Staff's recommendation and initiated a new docket, No. 19-055-U: the tariff docket. In the tariff docket, the Commission issued two orders of significance to this appeal: Order No. 1 and Order No. 4.

In Order No. 1, the Commission granted the General Staff's request for expedited consideration and made "all jurisdictional electric utilities having currently approved net-

---

[6]A tariff is a document, approved by the Commission, that lists all of the terms and conditions under which utility services will be provided to customers within a particular class. Tariff sheets typically include all of the different rate schedules that the utility offers, the metering methods, and the rules and regulations that the utility follows in carrying out its business with its customers.

9

metering tariffs parties to [the tariff docket] without petitioning for intervention." It further directed the utilities to file responses to the motion by September 23, 2019. In Order No. 4, the Commission stated that "[a]lthough there are disagreements about implementation of [some] provisions in Act 464 [including the new rate-structure options the act made available]," there were other provisions that "became effective with Act 464 and should not be subject to debate." The Commission, therefore, ordered all electric utilities operating in Arkansas to "file a revised net-metering tariff . . . that conforms with Act 464 of 2019" within seven days.

The electric utility providers all responded to Order No. 4 by filing revised net-metering tariffs. The Commission rejected some filings provided by the electric utility providers, including the filing from Petit Jean. The electric utility providers who had their filings rejected resubmitted revised filings. Eventually, the Commission accepted the revised filings from every electric utility provider except for Petit Jean. Petit Jean made several attempts to file a revised tariff, but the Commission rejected each attempt. We will address the detailed circumstances of those attempts and rejections later in our discussion of Petit Jean's appeal from the Commission's orders.

Meanwhile, the proceedings in Phase 3 of the rulemaking docket were continuing with the Commission reopening the hearing record and scheduling a hearing for additional public comments. On June 1, 2020, the Commission issued Order No. 28, the final order in the rulemaking docket. Among other findings, the Commission determined that low penetration of net-metering facilities (and the resulting lack of evidence of unreasonable cost

10

shifting) warranted retaining 1:1 compensation for smaller net-metering facilities. The Commission also decided, however, that "some evidence of potential cost-shifting" in the cases of larger net metering facilities (those that generated over 1,000 kWh of electricity) warranted a grid charge for those facilities. The Commission denied the parties' petitions for rehearing in Order No. 33, which it issued on September 28, 2020. These appeals followed.

II. *Scenic Hill and AECC*

A. Standards of Review

The Commission has wide discretion in choosing its approach to rate regulation, and this court does not advise the Commission on how to make its findings or exercise its discretion. *Entergy Ark., Inc. v. Ark. Pub. Serv. Comm'n*, 104 Ark. App. 147, 154, 289 S.W.3d 513, 519 (2008). In fact, this Court's review is limited by Ark. Code Ann. § 23-2-423(c) (Supp. 2021), which provides in part:

> (3) The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive; and

> (4) The review shall not be extended further than to determine whether the Commission's findings are supported by substantial evidence and whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or the State of Arkansas.

In other words, we must affirm the Commission's action if it is supported by substantial evidence. In order to establish absence of substantial evidence, "the appellant must demonstrate that the proof before the Commission was so nearly undisputed that fair-

11

minded persons could not reach its conclusion." *Entergy Ark.*, 104 Ark. App. at 154, 289 S.W.3d at 520.

We may reverse the Commission when it acted arbitrarily or capriciously. "Administrative action may be regarded as arbitrary and capricious where it is not supportable on any rational basis, and something more than mere error is necessary to meet the test." *Id.* "To set aside the Commission's action as arbitrary and capricious, [an] appellant must prove that the action was a willful and unreasoning action, made without consideration and with a disregard of the facts or circumstances of the case." *Id.* at 154–55, 289 S.W.3d at 520. In the absence of unjust, arbitrary, unreasonable, unlawful, or discriminatory action, we must affirm the Commission. *E.g.*, *Entergy Ark.*, 104 Ark. App. at 154, 289 S.W.3d at 520.

Our standard of review concerning the Commission's statutory interpretation is different. We give no deference to the Commission's interpretation of the AREDA. The supreme court recently clarified that agency interpretations of statutes are reviewed de novo. *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 5, 597 S.W.3d 613, 617. Therefore, in considering the meaning and effect of a statute, this court construes it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* An unambiguous statute will be interpreted solely on the basis of the clear meaning of the text. *Id.* But where ambiguity exists, this court may be guided—but not bound—by the agency's interpretation. *Id.* With these standards in mind, we provide a preliminary discussion of AREDA's provisions (as amended by Act 464) and some of the findings of the Commission

for an understanding of the issues that Scenic Hill and AECC raise in their respective appeals.

B. The Statutory Provisions at Issue

Arkansas Code Annotated section-23-18-604(b)(1) (Supp. 2021) mandates that the Commission shall, following notice and opportunity for public comment, establish appropriate rates, terms, and conditions for net metering. Likewise, Arkansas Code Annotated section 23-18-604(a) mandates that "an electric utility *shall allow* net-metering facilities to be interconnected using a standard meter capable of registering the flow of electricity in two (2) directions." (Emphasis added.) Thus, two important issues arise: (1) what constitutes a net-metering facility, and (2) what are the appropriate rates, terms, and conditions applicable to such facility.

To the first issue, § 23-18-603(8)(A) (Supp. 2021) states that a net-metering facility is "a facility for the production of electric energy" that "uses solar, wind, hydroelectric, geothermal, or biomass resources to generate electricity, including, but not limited to, fuel cells and micro turbines that generate electricity if the fuel source is entirely derived from renewable resources." Arkansas Code Annotated § 23-18-603(8)(B), however, sets forth legislative distinctions between net-metering facilities based on use and generating capacity. Arkansas Code Annotated § 23-18-603(8)(B)(i) discusses residential net-metering facilities with generating capacities of not more than "the greater of twenty-five kilowatts (25 kW) or one hundred percent (100%) of the net metering customer's highest monthly usage in the previous twelve (12) months of residential use"; Arkansas Code Annotated § 23-18-

603(8)(B)(ii) discusses "other than residential" net-metering facilities with generating capacities of one thousand kilowatts or less. Reading sections 23-18-604(a) and 23-18-603(8) together, we conclude that an electric utility must allow interconnection of net-metering facilities with generating capacities below 1,000 kW.

Net-metering facilities with generating capacities over the 1,000-kW threshold are another matter. In order to interconnect, they must be approved by the Commission pursuant to statutory criteria. For facilities with a generating capacity between 1,000 kW and 5,000 kW, the AREDA gives the Commission discretion to allow a net-metering facility if

> (i) the net-metering facility is not for residential use;
>
> (ii) Increasing the generating capacity limits for individual net-metering facilities results in distribution system, environmental, or public policy benefits or allowing an increased generating capacity for the net-metering facility would increase the state's ability to attract businesses in Arkansas; and
>
> (iii) Allowing an increased generating capacity for the net-metering facility is in the public interest[.]

Ark. Code Ann. § 23-18-604(b)(9)(A). For facilities with a generating capacity of greater than 5,000 kW and up to 20,000 kW, the AREDA gives the Commission discretion to allow a net-metering facility if, in addition to all of the criteria above, it determines that "allowing an increased generating capacity for the net-metering facility does not result in an unreasonable allocation of costs to other utility customers." Ark. Code Ann. § 23-18-604(b)(9)(B)(iii).

To the second issue posited above, Act 464 amended the AREDA to give the Commission a series of options for determining the rate structure for net-metering customers

depending on the size of the facility and on whether the net-metering customers' electric bills are "without a demand component" or "with a demand component."[7] For net-metering customers with a demand component, the Commission "shall" require 1:1 compensation. Ark. Code Ann. § 23-18-604(b)(6). For net-metering customers without a demand component, the Commission has the discretion to (1) continue with 1:1 compensation pursuant to Ark. Code Ann. § 23-18-604(b)(2)(A); (2) adopt two-channel billing pursuant to Ark. Code Ann. § 23-18-604(b)(2)(B), authorizing electric utilities to impose a grid charge pursuant to Ark. Code Ann. § 23-18-604(b)(2)(C); or (3) take other appropriate action pursuant to Ark. Code Ann. § 23-18-604(b)(2)(D). Before taking any of these alternatives, however, the Commission must first determine that its chosen action is "in the public interest" and "will not result in an unreasonable allocation of or increase in costs to other utility customers." Ark. Code Ann. § 23-18-604(b)(2)(B).

Act 464 also added other provisions to this issue concerning the appropriate rate, terms, and conditions applicable to net-metering facilities. The AREDA now expressly requires grandfathering for certain net-metering customers, providing, in relevant part, that the Commission

> shall allow the net-metering facility of a net-metering customer who has submitted a standard interconnection agreement, as referred to in the rules of the Arkansas Public Service Commission, to the electric utility after July 24, 2019, but before December 31, 2022, *to remain under the rate structure* in effect when the net-metering contract was

---

[7]A demand charge is a per-kilowatt-hour charge that is usually reserved for large commercial customers. It is intended to recover a utility's costs of operating during peak demand.

signed, for a period not to exceed twenty (20) year, subject to approval by a commission.

Ark. Code Ann. § 23-18-604(b)(10)(A) (Supp. 2021) (emphasis added).

In addition, Act 464 added a provision regarding "meter aggregation." Generally, an electric utility must "separately meter, bill, and credit each net-metering facility even if one (1) or more net-metering facilities are under common ownership." Ark. Code Ann. § 23-18-604(c)(1) (Supp. 2021). Act 464, however, gives a net-metering customer the discretion to request that net-metering credits from one net-metering facility be applied to the bill for another meter location if "the net-metering facility and the separate meter location are under common ownership within a single electric utility's service area." Ark. Code Ann. § 23-18-604(c)(2)(A)(i) (Supp. 2021).[8]

## C. The Findings of the Commission

In Order No. 28, the Commission "approv[ed] revised NMRs to implement the provisions of Act 464." For demand-component customers with generating capacities up to 1,000 kW, the Commission found "that continuation of 1:1 full retail credit for net excess generation is [expressly] required" under section 23-18-604(b)(6). For residential and nonresidential customers *without* a demand component, the Commission declined to

---

[8]According to the Commission, the common-ownership requirement in § 23-18-604(c)(1) does not apply "if more than two customers that are governmental entities or other entities that are exempt from state and federal income tax [under another provision of the AREDA] co-locate at a site hosting the net-metering facility." Ark. Code Ann. § 23-18-605(c)(2)(A)(ii) (Supp. 2021).

authorize two-channel billing or impose a grid charge for customers.[9] Rather, the Commission found that the current 1:1 full retail credit for excess generation should be retained "for now" as the default net-metering structure. The Commission found that after December 31, 2022, "a utility may request approval of an alternative [rate structure] that is in the public interest and will not result in an unreasonable allocation of, or increase in, the costs to other utility customers."

For demand-component customers above 1,000 kW, the Commission made several key findings. First, it determined that section 604(b)(6) applied an exception to larger customers over 1,000 kW so that they also must receive a 1:1 credit. Second, the Commission interpreted subdivision (b)(6) to include an exception for large facilities that "preserv[ed] the Commission's discretion and authority to determine the appropriate net-metering rate structure under both the 'public interest' and 'unreasonable allocation of costs' standards, as applicable to these large demand-component customers."

Third, the Commission determined that it may consider the potential for an "unreasonable allocation of costs" as a criterion for approving facilities generating between 1,000 kW and 5,000 kW under section 604(b)(9)(A) as well as approving facilities generating over 5,000 kW under subdivision (b)(9)(B). In so doing, the Commission recognized that "unreasonable allocation of costs" is not enumerated among the criteria for facilities that generate under 5,000 kW but determined that its obligation to consider the "public interest"

---

[9]These were positions advanced by the electric utilities.

17

under section 604(b)(9)(A)(iii) included a determination of whether unreasonable cost shifting to other customers would occur.

Applying those standards to the evidence presented, the Commission found "that there is some evidence of potential cost-shifting" that warranted a change in the net-metering rate structure for demand-component facilities generating over 1,000 kW. The Commission retained 1:1 compensation for those customers but also added a grid charge that the Commission "initially . . . set at zero." According to the Commission, "once the Net-Metering Rules become effective, a utility may request approval of a revised grid charge rate based upon evidence that an unreasonable cost shift to non-net-metering customers is occurring or has already occurred on a cumulative basis."

The Commission also revised its NMRs to address two other issues: "gaming" and "grandfathering." "Gaming" was an issue of concern raised to the Commission by the utility providers. According to the providers, gaming occurs when a large facility is divided into several smaller ones for the purpose of evading the AREDA's generation-capacity limits. In response to this concern, General Staff recommended amending NMR 2.06(A) to define "generating capacity" as including "the aggregate ability to produce electricity from all net-metering facilities under common ownership that are located within a single utility's territory." The Commission adopted this recommendation, determining that

> absent evidence proffered by the net-metering customer, multiple net-metering facilities under common ownership within a single utility's service area will be treated as a single facility for the purpose of determining whether the facility exceeds the [1,000 kW] capacity limit provided by Ark. Code Ann. § 23-18-603(8)(B)(ii) and thus is subject to Commission approval pursuant to Ark. Code Ann. § 23-18-604(b)(9).

18

Concerning "grandfathering," the Commission determined that Act 464 gave it the option to allow grandfathering to net-metering customers "individually or as a group." The Commission found that grandfathering eligible[10] nonresidential customers with generating capacities of 1,000 kW or less would be "automatic" because "customers pursuing projects within these size limits are legislatively exempted by Act 464 from even applying to the Commission for approval to install such facilities." For eligible customers with generating capacities over the 1,000-kW threshold, the Commission found that grandfathering would be on a case-by-case basis as the customer sought Commission approval for installation under section 604(b)(9).

In addition, the Commission rejected the electric utilities' arguments that section 23-18-603(8)(e) and section 23-18-604(a) together provide that a net-metering customer's generating facility (such as solar panels) and their load (the home or business that consumes the power generated by the net-metering facility) must both be located behind the same meter.[11] The Commission found that "the generation meter does not have to be physically attached to the facility using electricity." Finally, the Commission interpreted the meter-aggregation provisions in the AREDA as excluding tax-exempt entities from the requirement

---

[10]As indicated in the AREDA, eligibility is determined by the date that the customer submitted a Standard Interconnection agreement to their electric utility.

[11]This argument is called "remote generation."

19

that meters must be "under common ownership" before they can be aggregated for billing purposes.

Having outlined the relevant findings of the Commission, we now turn our attention to the specific arguments raised by the separate appellants Scenic Hill and AECC.

D. Scenic Hill

Scenic Hill raises three points in its appeal. It challenges the Commission's statutory interpretation of Act 464 in its first two points on appeal. We will address these points under our statutory-interpretation standard of review. In its third point, Scenic Hill argues that a specific finding of the Commission is not supported by substantial evidence. Accordingly, we will address this point under our substantial-evidence standard of review.

1. *Definition of "generation capacity" or "gaming"*

Scenic Hill first argues that the Commission erred when it revised NMR 2.06 to define "generation capacity" as including "the aggregate ability to produce electricity from all net-metering facilities under common ownership that are located within a single utility's territory." Scenic Hill says this definition is contrary to the plain language of Act 464.

Scenic Hill argues that the Commission's definition of "generation capacity" requires the Commission to approve the interconnection of net-metering facilities below 1,000 kW when they are installed by customers with existing facilities that would generate more than 1,000 kW cumulatively with the new facility. The Commission responds that Act 464, particularly its provisions allowing meter aggregation, authorizes its aggregate definition of generation capacity.

Our basic rule of statutory construction is to give effect to the intent of the legislature. *Simpson v. Cavalry SPV I, LLC*, 2014 Ark. 363, at 3, 440 S.W.3d 335, 337. Where the language of the statute is plain and unambiguous, the court determines the legislative intent

21

from the ordinary meaning of the language used. *Id.* In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* at 3, 440 S.W.3d at 337–38. We also construe the statute so that no word is left void, superfluous, or insignificant, and this court gives meaning and effect to every word in a statute, if possible. *Id.* at 3, 440 S.W.3d at 338. If the language is clear and unambiguous and conveys a clear and definite meaning, it is unnecessary to resort to the rules of statutory interpretation. *Id.* We will not give statutes a literal interpretation, however, if such an interpretation leads to absurd consequences that are contrary to legislative intent. *Id.*

As already indicated, the AREDA, amended by Act 464, defines "net-metering facility" as a facility for the production of electricity that has a generating capacity of not more than 1,000 kW,[*see* Ark. Code Ann. § 23-18-603(8), and mandates that electric utilities "shall allow net-metering facilities to be interconnected using a standard meter capable of registering the flow of electricity in two (2) directions." *See Id.* § 23-18-604(a). The AREDA further grants the Commission the power to "establish appropriate rates, terms, and conditions for net metering." *See Id.* § 23-18-604(b). We find no language in these provisions indicating that the Commission must approve the interconnection of net-metering facilities of not more than 1,000 kW. Conversely, the Commission is specifically authorized to approve only net-metering facilities with generating capacities between 1,000 kW and 20,000 kW. *See Id.* § 23-18-604(b)(9). Granted, Act 464 does address meter aggregation. *See Id.* § 23-18-604(c)(1). However, Act 464 addresses meter aggregation only as to the electric utilities

22

and their net-metering customers.[12] It does not mention the Commission or grant it the authority to consolidate net-metering facilities for the purpose of approval.

The Commission "is a creature of the legislature and must act within the power conferred upon it by legislative act." *Brandon v. Ark. Pub. Serv. Comm'n*, 67 Ark. App. 140, 149, 992 S.W.2d 834, 839 (1999). We conclude that Act 464 plainly limits the Commission's authority to approve net-metering facilities to those that generate in excess of 1,000 kW and that there is no language authorizing Commission approval of facilities generating less than 1,000 kW or suggesting that the capacity thresholds triggering Commission approval can be determined by aggregating a customer's net-metering facilities. Accordingly, we reverse Order No. 28 and the revised NMRs to the extent that their definition of "generation capacity" allows the Commission to approve net-metering facilities generating 1,000 kW or less.

*2. Demand facilities generating over 1,000 kW*

For its second argument on appeal, Scenic Hill contends that Order No. 28 should be reversed because the Commission impermissibly ignores the plain statutory distinction of demand facilities generating over 1,000 kW. Scenic Hill contends that the approval criteria for smaller demand facilities—those that generate from 1,000 kW to 5,000 kW—is different than the approval criteria for larger demand facilities—those that generate from 5,000 kW to

---

[12]The Act summarily provides that the utilities must separately bill commonly owned net-metering facilities and allow customers—at their discretion—to apply net-metering credits to another meter location.

20,000 kW— as set forth in section 604(b)(9). Scenic Hill argues that the approval criteria for smaller-demand facilities contain only three elements, while the approval criteria for larger demand facilities contain four. Here, the Commission applied all four elements of the approval criteria for larger-demand facilities to the smaller-demand facilities, and Scenic Hill contends that such application is contrary to the intent of the General Assembly as expressed in the plain language of the statute. The Commission agrees that the approval criteria is different but argues that its general obligation to "establish appropriate rates, terms, and conditions for net-metering" authorizes the discretion to apply other criteria. More specifically, the Commission argues that is has an obligation to account for the public interest and that this obligation includes making a finding as to whether other utility customers would be affected by unreasonable allocation of costs, regardless of the demand facility size. Once again, we must utilize our standard of review for statutory construction.

Section 604(b)(9) sets forth the approval criteria for the Commission to utilize when approving a net-metering facility with a generating capacity not to exceed 20,000 kW. For any net-metering facility generating between 1,000 kW and 5,000 kW, the approval criteria are:

> (i) The net-metering facility is not for residential use;
>
> (ii) Increasing the generating capacity limits for individual net-metering facilities results in distribution system, environmental, or public policy benefits or allowing an increased generating capacity for the net-metering facility would increase the state's ability to attract businesses in Arkansas; and
>
> (iii) Allowing an increased generating capacity for the net-metering facility is in the public interest[.]

24

Ark. Code Ann. § 23-18-604(b)(9)(A). For any net-metering facility with a generating capacity of greater than 5,000 kW, the approval criteria include the three elements listed above as well as a fourth element that "allowing an increased generating capacity for the net-metering facility does not result in an unreasonable allocation of costs to other utility customers." Ark. Code Ann. § 23-18-604(b)(9)(B)(iii).

We conclude that a plain reading of section 604(b)(9)(A) sets forth three elements for approval of smaller-demand facilities, while section 604(b)(9)(B) sets forth four elements for approval of larger-demand facilities. While the three elements listed in section 604(b)(9)(A) are included in section 604(b)(9)(B), the fourth element—the potential for an unreasonable allocation of costs—is contained only in section 604(b)(9)(B). The language of the statute is clear: unreasonable allocation of costs is not among the findings that the Commission must make before approving a facility under section 604(b)(9)(A). Because the Commission found that it must make a finding regarding unreasonable cost shifting for facilities generating between 1,000 kW and 5,000 kW, it erred.

In reaching our conclusion, we have considered the Commission's arguments. It argues that section 604(b)(9) provides that it may—not must—approve facilities that it finds meet the criteria in section 604(b)(9)(A) and (B). The Commission says that, in other words, it retains the discretion to reject facilities that otherwise meet all the enumerated criteria for their proposed generation capacities. In addition, the Commission cites authority from other

25

jurisdictions to support its proposition that "the public interest" necessarily includes considering the costs to other customers. We are not persuaded.

We are more persuaded by Scenic Hill's assertion that adopting the Commission's interpretation of the public-interest criterion—as including consideration of unreasonable allocation of costs—would render superfluous the language requiring a finding that "allowing an increased generating capacity for the net-metering facility [generating between 5,000 kW and 20,000 kW] does not result in an unreasonable allocation of costs to other utility customers" in section 604(b)(9)(B)(iii). We agree that the General Assembly separately enumerated the findings of unreasonable allocation of costs and the public interest in section 604(b)(9)(B)(iii) and (iv) and conclude that it did so by intention. The General Assembly's intent that they be treated separately is also evident in Act 464's other provisions requiring the Commission to make findings that its actions are "in the public interest *and* doing so will not result in an unreasonable allocation of or increase in costs to other utility customers." Ark. Code Ann. § 23-18-604(b)(2)(A) & (D) (emphasis added). Accordingly, we reverse the Commission's determination that it may consider the potential for unreasonable allocation of costs for facilities generating between 1,000 kW and 5,000 kW.

### 3. *Grid charge*

Scenic Hill concludes by arguing that the Commission erred when it imposed a zero-dollar grid charge on all demand-component facilities whose generation capacities exceed 1,000 kW because the Commission's rationale for imposing the grid charge—that cost shifting was occurring with the larger facilities—is not supported by substantial evidence.

26

Accordingly, we will utilize our substantial-evidence standard of review. We agree that the Commission erred by imposing the grid charge.

Here, the Commission found, pursuant to Arkansas Code Annotated section 23-18-604(b)(6), that demand-component customers must receive 1:1 credit for excess electricity that they send to the grid. Section 23-18-604(b)(6) has an exception: "except as provided in subdivision (b)(9) of this section." The Commission interpreted the subdivision (b)(9) exception as referring to its discretion to withhold approval for large facilities that, *inter alia*, are likely to result in an unreasonable allocation of costs to other utility customers. According to the Commission, it has the power to disapprove those facilities, and by implication, it has a corresponding power to impose an additional rate structure that would remedy the facility's cost-shifting potential. In Order No. 28, the Commission found that such approval would, *inter alia*, be based on the imposition of a grid charge for those facilities that otherwise would result in an unreasonable allocation of costs. The Commission then decided to impose a zero-dollar grid charge. The NMR associated with this finding, Rule 2.04(a)(3)(b) & (c), requires electric utilities to "bill the net-metering customer a grid charge," and "the grid charge rate shall initially be set at zero effective May XX, 2020." Scenic Hill challenges the imposition of the zero-dollar grid charge, contending that it is not supported by substantial evidence. We agree with Scenic Hill.

Here, the Commission observed that the electric utilities made only "allegations" of unreasonable cost shifting, and it lacked "utility-specific data and evidence" to calculate a grid charge. In fact, the Commission found "that there is *some* evidence of potential cost-

shifting" that warranted a change in the net-metering rate structure for demand-component facilities generating over 1000 kW. (Emphasis added.)

In its brief, the Commission cites pages in Order No. 28 that purport to discuss "the extensive evidence supporting a grid charge." We disagree; our review of these citations has proved vain for such evidence.[13] Rather, it appears that the only evidence of cost shifting is summarized in a footnote in Order No. 28 wherein an expert witness estimated *potential* cost shifts for three proposed net-metering projects. There was no evidence, in other words, that unreasonable cost shifting had actually occurred. In fact, the Commission's noted lack of "utility-specific data and evidence" suggests that evidence of cost shifting, if any, is hardly substantial.[14] Accordingly, we agree that the Commission erred by requiring utilities to bill its net-metering customers for a grid charge.

## E. AECC

On appeal, AECC raises multiple arguments for reversal with some arguments containing subpoints. We conclude that AECC has failed to preserve some arguments and that we are procedurally barred from addressing them. We further conclude that AECC has properly preserved some arguments and will address then accordingly.

---

[13]The cited pages appear to thoroughly summarize the parties' arguments for and against a grid charge, but there is no apparent discussion of the evidence supporting the utilities' allegations of cost shifting for net-metering facilities generating over 1,000 kW.

[14]The Commission actually notes in its brief that "in the year since the issuance of Order No. 28 no utility has yet applied to set its specific grid charge, *thus signaling either that the utilities are not experiencing any cost-shifting or that they are not concerned about its level.*" (Emphasis added.)

## 1. *Arguments not preserved*

In its brief, AECC makes the following five arguments: (1) the Commission erred when it determined that section 604(b)(6) requires 1:1 compensation, or "the full retail rate," for "net-metering customers who receive service under a rate that includes a demand component" and whose facilities generate less than 1,000 kW; (2) the Commission erred when it granted automatic grandfathering for existing net-metering facilities that generate less than 1,000 kW; (3) the Commission erred with respect to meter aggregation; (4) the Commission erred when allowed remote generation in which a generation facility—like solar panels—may be at a location separate from its load or the facility that uses the generated energy; and (5) the Commission exercised an unconstitutional taking of public utilities' property in Order Nos. 28 and 33. The Commission and the joint appellees respond that AECC failed to preserve these issues for appellate review by properly raising them in its petition for rehearing. We agree.

Arkansas Code Annotated section 23-2-423(c)(2) (Supp. 2021) provides that "[n]o objection to any order of the commission shall be considered by the Court of Appeals unless the objection shall have been urged before the commission in the application for rehearing." "In order to preserve an argument for appeal, the issue must be made and developed before [the Commission]." *Whorton v. Dixon*, 363 Ark. 330, 333, 214 S.W.3d 225, 228 (2005). Conclusory assertions and general statements do not rise to the level of developed argument that preserves an issue for appellate review. *See Nat'l Bank of Com. v. Quirk*, 323 Ark. 769, 782, 918 S.W.2d 138, 145 (1996). With these provisions in mind, we now address why

AECC failed to preserve each of the above-stated five arguments for purposes of appellant review.

## a. Section 604(b)(6)

Before the Commission, AECC argued, generally, that the Commission erred in retaining 1:1 compensation for all net-metering customers. On appeal, AECC argues, specifically, that the Commission "added words to the statute" because section 604(b)(6) "does not mention, much less require, a specific rate, including the full retail rate." We conclude that AECC did not allege a misinterpretation of section 604(b)(6) in the proceedings before the Commission. Therefore, we decline to reach the argument on appeal.

## b. Grandfathering

In its appellate brief, AECC argues that the grandfathering provision in the AREDA refers to "net-metering facility" and "net-metering customer" only in the singular. According to AECC, our rules of statutory construction and the supreme court's decision in *Hempstead County Hunting Club v. Arkansas Public Service Commission*, 2010 Ark. 221, 384 S.W.3d 477, direct that the Commission may grant grandfathering only on a case-by-case basis and that the Commission erred in finding it had the discretion to allow grandfathering to a group.

We decline to reach the merits of this argument. Before the Commission, AECC addressed the Commission's grandfathering decision in a footnote in its petition for rehearing. There, AECC asserted that

> Ark. Code Ann. § 23-8-604(b)(1) (sic) refers to the concept of grandfathering in the context of "a net metering customer." Accordingly, contrary to Order No. 28's

30

approach, grandfathering should not be approved by the Commission for any net-metering facility, absent case by case.

In our view, these statements do not rise to the level of developed argument that preserves the grandfathering issue for appellate review for two reasons. First, we conclude that an argument raised only in a footnote is not adequately raised or preserved for appellate review. *Cf. State v. Santana-Lopez*, 613 N.W.2d 918, 922 n.4 (Wis. Ct. App. 2000). Second, the footnote does not mention, let alone apply, any rules of statutory construction or relevant precedent, as AECC now does for the first time here.

### c. Meter aggregation

Arkansas Code Annotated section 604(c)(2)(A)(i) allows meter aggregation as long as the net-metering facility and the separate meter location are under common ownership. The Commission interpreted the meter-aggregation provisions in the AREDA as excluding tax-exempt entities from the requirement that meters must be "under common ownership" before they can be aggregated for billing purposes and entered a standard tariff to that effect. AECC disagreed with this interpretation and, in its petition for rehearing, argued a "mismatch in language between the [revised NMRs] and the standard tariff provision," referencing Ark. Code Ann. § 23-18-604(c).

In its appellate brief, AECC argues that section 604(c)(2)(A)(ii) provides that section 604(c)(2)(A)(i) "does not apply if more than two (2) customers that are governmental entities or other entities that are exempt from state and federal income tax defined under § 23-18-603(7)(C) co-locate at a site hosting the net-metering facility." We do not address the merits

of this argument because AECC first raised this position in footnote 28 of its petition for rehearing. As previously stated, we conclude that an argument raised only in a footnote is not adequately raised or preserved for appellate review. In addition, we do not address the merits of this argument because AECC failed to develop this argument before the Commission. In its petition for rehearing, AECC did not explain, as it does here, that section 604(c)(2)(A)(ii) made meter aggregation unavailable for governmental or other tax-exempt entities that are located together at a site hosting a net-metering facility. It also did not make the related argument that the Commission erred by interpreting section 604(c)(2)(A)(ii) as only removing common ownership as a prerequisite to meter aggregation for those facilities. Therefore, we decline to reach them here.

### d. Remote generation

According to AECC, two provisions in the AREDA prohibit remote generation: Arkansas Code Annotated sections 23-18-604(a) and

23-18-603(8)(E). Once again, we decline to address these arguments.

As with other arguments unpreserved, AECC raised the issue of remote generation in a footnote, asserting only that "Order No. 28 permits generation to be physically detached from the facility using electricity. In doing so, Order No. 28 opens the door for retail wheeling in potential violation of applicable [Federal Energy Regulatory Commission] rules and federal law, as well as the takings clauses of the Arkansas and United States Constitution." AECC did not argue in its petition for rehearing, as it does now, that sections

32

604(a) and 603(8)(E) prohibit remote generation. Therefore, we also decline to reach the merits of this issue.

### e. Taking without just compensation

AECC contends, in three respects, that the Commission exercised an unconstitutional taking of public utilities' property. First, it asserts that remote generation allows "uncompensated use of utility assets paid for by all utility customers, is confiscatory, and, if allowed to stand, renders no-load meter aggregation an unconstitutional taking of property without just compensation." Second, AECC says the Commission's orders allow all net-metering customers to "sell" their net excess generation using the public utilities' assets, including transmission lines and distribution lines, without any compensation. Third, AECC argues that requiring 1:1 compensation, or credit for the "full retail rate," unlawfully takes the utilities' revenue, which, according to AECC, "harms both the utility and all of its net-metering customers."

We decline to address these arguments because AECC failed to develop these before the Commission. In its' petition for rehearing, AECC raised a limited constitutional argument in a footnote, quoted above, that addressed only remote generation and made passing references to the takings clauses in the state constitution and federal constitution. For the reasons that we have already stated, those conclusory assertions are inadequate to preserve the constitutional arguments that AECC makes here. Therefore, we must once again decline to reach the merits.

### 2. *Arguments preserved*

33

a. 1:1 compensation: net-metering customers without a demand component

AECC argues that this court should reverse Order No. 28 and Order No. 33 because the Commission failed to make adequate findings that 1:1 compensation was a "just and reasonable" rate for residential and nonresidential customers without a demand component. AECC contends that the Commission's only justification for retaining 1:1 compensation for these customers was the low penetration levels of net-metering facilities in Arkansas and that this is inadequate. Rather, according to AECC, the Commission should have "analyzed or justified" how 1:1 compensation was "just and reasonable" when compared to the less expensive "avoided cost rate" that would be paid in a rate structure that included two-channel billing. In this process of analyzation and justification, AECC asserts that the Commission should have explained, among other things, "[w]hat quantifications, computations, or other specific evidence supported the Commission's conclusion that the full retail rate" should be paid to these customers. AECC asserts that a more thorough analysis would have demonstrated that 1:1 compensation was not just and reasonable because it was "over compensatory" and "[pays] net-metering customers for services they do not provide." In essence, AECC is arguing that the Commission's findings are not supported by substantial evidence. Accordingly, we will address this point under our substantial-evidence standard of review.

In response, the Commission observes that 1:1 compensation has been in place since net metering was adopted in Arkansas, and Act 464 recognizes it as a valid and reasonable rate structure. The Commission further argues that Orders Nos. 28 and 33 contain adequate

34

findings supported by substantial evidence. Specifically, the Commission asserts that Act 464 left it with the discretion to retain 1:1 compensation for non-demand-component customers without making any additional findings. The Commission determined that the low penetration of net-metering facilities in Arkansas and the consequent lack of sufficient evidence of unreasonable cost shifting warranted doing just that. The Commission also determined that a lack of sufficient evidence of "quantifiable benefits" as well as the public policy to encourage the development of renewable energy justified its decision not to adopt two-channel billing—the electric utilities' preferred alternative to 1:1 compensation.[15]

We conclude that the Commission's decision to retain 1:1 compensation for customers without a demand component does not warrant reversal under our deferential standard of review. As the Commission argues in its brief, 1:1 compensation is a valid and reasonable rate structure. It has been in place since net metering was adopted in Arkansas, and Act 464 retains it as an option for net-metering customers without a demand component. In other words, the General Assembly gave the Commission the discretion to do what it did: retain 1:1 compensation for customers without a demand component.

Still, AECC argues that this exercise of discretion is based on insufficient analysis and findings. Admittedly, the Commission retained 1:1 compensation for net-metering

---

[15]Section 23-18-604(b)(2)(B)(iii) and (iv) provides that in a rate structure that includes two-channel billing, net-metering customers must be paid the "avoided cost rate" as well as "an additional sum" for the electricity that they supply to the grid. The additional sum "may be applied after the demonstration of quantifiable benefits" by the net-metering customer and shall not exceed 40 percent of the avoided cost of the electric utility.

customers without a demand component on the basis of a single factual finding: the low levels of penetration of facilities that produce renewable energy. We conclude, however, that this finding is supported by substantial evidence.

The General Assembly has tasked the Commission with establishing rates for net-metering customers. The Commission responded with a 1:1 compensation rate structure. Utility providers sought legislative relief, and the General Assembly responded with Act 827. Act 827 charged the Commission with establishing rates that "recover[ed] [an] electric utility's entire cost of providing service to each net-metering customer within each electric utility's class of customers" and accounted for "any quantifiable benefits associated with the interconnection with and providing service to the net-metering customer." In years that followed, the parties litigated whether 1:1 compensation, two-channel billing, or some other rate structure met those criteria with little success because Arkansas's low penetration level prevented an accurate assessment of costs and benefits. While this was ongoing, the General Assembly enacted Act 464, allowing the Commission to retain 1:1 compensation without any determination of relative costs and benefits.

In the record on appeal, the Commission was presented evidence that net-metering customers made up less than one percent of the electric utility customers in Arkansas, and a minimum of five percent penetration would be necessary to accurately determine the impact of net-metering in the state. With this evidence, the Commission made a finding to retain 1:1 compensation while the penetration level was still low and to set a future date when the level may be higher—December 31, 2022—for individual utilities to come forward with

36

evidence of unreasonable cost shifting to warrant the adoption of an alternative rate structure

under 604(b)(2)(B). We conclude that this finding is supported by substantial evidence and

does not warrant reversal.

### b. 1:1 compensation: net-metering customers generating over 1,000 kW with a demand component

AECC next argues that the Commission failed to make adequate findings to support

retaining 1:1 compensation for demand-component customers with facilities generating

more than 1,000 kW. We disagree.

Section 604(b)(6) provides as follows:

> [e]xcept as provided in subdivision (b)(9) of this section, for net-metering customers who receive service under a rate that includes a demand component, [the Commission] *shall require* an electric utility to credit the net-metering customer with any accumulated net excess generation in the next applicable billing period and base the bill of the net-metering customer on the net amount of electricity that the net-metering customer has received from or fed back to the electric utility during the billing period.

(Emphasis added.)[16] By using the term "shall" in section 604(b)(6), the legislature "intended

mandatory compliance with the statute." *See Benca v. Martin*, 2016 Ark. 359, at 7–8, 500

S.W.3d 742, 748. Accordingly, the Commission was required by legislation to retain 1:1

compensation for large demand-component customers.

---

[16]Arkansas Code Annotated section 23-18-603(5) defines "net excess generation" as "the amount of electricity as measured in kilowatt hours or kilowatt hours multiplied by the applicable rate that a net-metering customer has fed back to the electric utility that exceeds the amount of electricity as measured in kilowatt hours or kilowatt hours multiplied by the applicable rate used by the customer during the applicable period determined by a commission."

c. The joint appellees' participation in the appeal

AECC also asserts that the joint appellees, including the Arkansas Advanced Energy Association, the National Audubon Society, and the Sierra Club, should be precluded from filing briefs or otherwise participating in the appeal.[17] AECC argues that none of the joint appellees are "aggrieved parties" who may participate in an appeal from an order of the Commission under Arkansas Code Annotated section 23-2-423(a)(1), citing *Black's Law Dictionary* as support for this argument.[18] AECC takes the position that the Commission is the only party who meets this definition of "appellee." We disagree.

Before this court, AECC filed pleadings styled "objection, motion to strike entry of appearance, and motion for clarification," seeking to strike the entries of appearance filed by the National Audubon Society and by the Arkansas Advanced Energy Association. In both petitions, AECC argued that the National Audubon Society and the Arkansas Advanced Energy Association were not parties to the appeal because they did not file any notice of appeal from the Commission's orders as required by section 23-2-423(a)(1). AECC

---

[17]AECC also argues that a fourth group, the Arkansas Electric Energy Consumers, should be precluded from participating in the appeal. The Arkansas Electric Energy Consumers, however, has not entered an appearance. The joint appellees' brief was filed only on behalf of the National Audubon Society, the Arkansas Advanced Energy Association, and the Sierra Club.

[18]*Black's Law Dictionary* defines an appellee as a "[parties] against whom an appeal is taken and whose role is to respond to that appeal." *Appellee*, *Black's Law Dictionary* (11th ed. 2014).

also argued, as it does here, that the National Audubon Society and the Arkansas Advanced Energy Association also were not proper appellees.

We denied AECC's motions to strike in separate orders entered on January 6 and January 13, 2021, respectively. AECC is, therefore, precluded from relitigating the participation of those parties by those orders. *Cf. Green v. George's Farms, Inc.*, 2011 Ark. 70, at 7, 378 S.W.3d 715, 720 (stating the rule that the law-of-the-case doctrine "provides that a decision of an appellate court establishes the law of the case for the trial [court] upon remand and for the appellate court itself upon subsequent review.").

We further deny AECC's motion regarding the Sierra Club in light of our previous rulings regarding the National Audubon Society and the Arkansas Advanced Energy Association. Concerning the Sierra Club, AECC does not make any argument that is materially different from those that this court has already rejected in its orders dated January 6 and January 13, 2021. Accordingly, we reject AECC's argument that the joint appellees should be precluded from filing a brief in this appeal.

## III. *Petit Jean*

Petit Jean argues that the Commission's orders should be reversed because the chairman of the Commission, Ted Thomas, allegedly engaged in injudicious conduct. Petit Jean raises three specific points of reversal: (1) Chairman Thomas initiated ex parte communication in which he intimidated a witness, and Thomas's conduct exhibited a disqualifying bias; (2) the Commission erred when it failed to rule on Petit Jean's motion to disqualify the chairman before issuing Order No. 28, and that this failure imputes Chairman Thomas's alleged bias to the entire Commission; and (3) Order No. 28 should be reversed because Chairman Thomas's biased conduct, which is imputed to the Commission, indicates that the Commission had already pretextually determined, before hearing additional evidence, that it would not adopt two-channel billing as a new rate structure. Because all three of these arguments center on the alleged conduct of Chairman Thomas, we begin our analysis with some factual background.

### A. Background

As previously discussed, the Commission initiated a tariff docket, No. 19-055-U, after the implementation of Act 464 and at the recommendation of the General Staff. In Order No. 1 of the tariff docket, the Commission made all electric utilities with existing net-metering tariffs parties and directed the utilities to file timely responses. In Order No. 4 of the tariff docket, the Commission ordered all electric utilities operating in Arkansas to "file a revised net-metering tariff . . . that conforms with Act 464 of 2019" within seven days.

In response, Petit Jean filed its first proposed tariff that did not include 1:1 compensation. Instead, Petit Jean's proposed tariff included two-channel billing. Consequently, the Commission rejected Petit Jean's proposed tariff and ordered Petit Jean to submit another revised tariff.

Petit Jean filed its second proposed tariff that also included two-channel billing and excluded 1:1 compensation. Supporting its proposed tariff for two-channel billing, Petit Jean included the written testimony of Craig Woycheese, an engineering and rate consultant with the firm Toth and Associates, who opined that the two-channel billing method was mentioned as a billing mechanism in Act 464. The Commission was unmoved, and it once again rejected Petit Jean's second proposed tariff and ordered the submission of a third proposed tariff. In response, Petit Jean submitted its third proposed tariff, which continued to advocate two-channel billing and was supported by Woycheese's written testimony.

Because Petit Jean continued to propose tariffs including two-channel billing and because the Commission's statutory deadline to rule on Petit Jean's tariff filing approached, Chairman Thomas initiated telephone contact with Adam Toth, the executive president of Toth and Associates, on January 17, 2020, directing Petit Jean to refile its proposed tariff by the end of the day.[19] When Petit Jean did not file another proposed tariff, the Commission entered Order No. 13. In this order, the Commission rejected the proposed tariff that Petit

---

[19]We will discuss more details of this telephone conversation subsequently.

41

Jean submitted and unilaterally revised Petit Jean's tariff to remove two-channel billing and other controverted provisions.[20]

We note that all of the above-mentioned orders and Commission actions occurred in the tariff docket and that Petit Jean has not appealed any of these orders or actions from the tariff docket. However, after the hearing in the rulemaking docket, Petit Jean filed a motion to disqualify Chairman Thomas from the rulemaking docket based on his actions in the tariff docket.

In this motion, Petit Jean argued that members of the Commission should be held to the same standards as those set forth in the Arkansas Code of Judicial Conduct, and Thomas violated those standards during his phone call to Toth. According to Toth, Thomas told him that Petit Jean and Toth had "seriously underestimated" how he (Thomas) would react to Petit Jean's tariff filing and written testimony, and that Petit Jean would need to refile its proposed tariff and testimony "by the end of [the] day." Toth further alleged that Thomas said that "if [Petit Jean] did not comply with his request by the end of the day, then anytime an employee of Toth appeared before the Commission that he would disqualify that person from testifying." Toth claimed that he "felt threatened by the words of Mr. Thomas in our phone call" and believed that Thomas "was threatening the business of Toth [and Associates] in Arkansas if Woycheese's testimony filed in support of [Petit Jean] was not withheld or changed by a new replacement filing." As a result, Petit Jean specifically alleged that Thomas

---

[20]The Commission also issued Order No. 14, which formally approved Petit Jean's tariff (as revised by the Commission).

42

engaged in "witness intimidation, witness tampering, [and] witness retaliation" relating to its witness, Woycheese, and that this conduct reflected "a manifestation of bias or prejudice" as well as "impropriety or the appearance of impropriety" and "unfairness that now impairs and taints [the rulemaking] proceeding." Petit Jean requested, therefore, that the Commission disqualify Chairman Thomas from the rulemaking docket.

Thomas filed a statement in response to Petit Jean's motion. In it, he explained that the proper rate, or billing methodology, for net metering, including two-channel billing, was "one of the most contested issues" and was a point of disagreement reserved for resolution in the rulemaking docket, not the tariff docket. Despite this, Petit Jean continually proposed a tariff that, if accepted by the Commission, "would have deprived the parties opposed to two-channel billing an opportunity to be heard." Thomas stated that Petit Jean had defied the orders of the Commission by submitting three proposed tariffs that included two-channel billing. Thomas further stated that the Commission was required to rule on Petit Jean's tariff filing by Friday, January 17, 2020, and that ordering Petit Jean to file a fourth tariff would have been a waste of time. As a result, he initiated the phone call with Tosh "with the purpose of communicating the urgency required by continuing defiance of a regulator by a regulated monopoly."

In response to Petit Jean's allegations, Thomas denied that he sought to change Woycheese's testimony and also denied the allegation that he would disqualify all witnesses from Toth and Associates in all future proceedings. Rather than intimidate a witness or change a witness's testimony, Thomas said he sought "to change the *conduct* of Petit Jean, a

43

monopoly utility that continues to substitute its judgment for the judgment of its regulator

in a manner that is contrary to law." (Emphasis in original). Finally, Thomas denied that he

had any bias that would affect the outcome of the rulemaking docket because

> [r]ejection of the tariff filed by Petit Jean three times by the Commission in [the tariff
> docket] was not on the merits of the two-channel billing proposal but on Petit Jean's
> improper attempt to insert and resolve a central issue from [the rulemaking docket]
> to [the tariff docket], even though [the rulemaking docket] was still pending.

Accordingly, Chairman Thomas declined to recuse himself, and the Commission issued

Order No. 28 in the rulemaking docket on June 1, 2020.

### B. Disqualifying Bias

Petit Jean argues that the "appearance of impropriety" standard that is implied in the

Arkansas Code of Judicial Conduct is applicable to Chairman Thomas and that his failure

to disqualify mandates a reversal of the Commission's orders. The Commission responds

that Thomas and the Commission were acting in a legislative capacity within the rulemaking

docket and that the Arkansas Code of Judicial Conduct does not apply to this capacity.

The Commission is quasi-judicial body that adjudicates public rights and claims in

individual cases, *see Brandon v. Ark. Pub. Serv. Comm'n*, 67 Ark. App. 140, 145, 992 S.W.2d

834, 836 (1999); it is also "a creature of the legislature [that] performs, by delegation,

legislative functions." *Lavaca Tel. Co., Inc. v. Ark. Pub. Serv. Comm'n*, 65 Ark. App. 263, 268,

986 S.W.2d 146, 149 (1999). These dual functions—and the difficulty of distinguishing

between them—make the Arkansas Code of Judicial Conduct inapposite for purposes of

determining whether Chairman Thomas should have recused himself. Rather, we are guided

44

by the recusal standard that the Commission has applied in similar circumstances. In a rule-making docket such as the one at issue here, Petit Jean must show that "that the particular statement made or action taken, in the context of issues under consideration appears to a reasonable person to taint the proceedings by the appearance of unfairness." *In re Ark. Power & Light Co.*, No. 84-249-U, Order No. 22, at 6 1985 WL 1198968 (Ark. P. S. C. July 26, 1985). While we do not condone the action of Thomas in the initiation of this communication, we conclude that Petit Jean has failed to show that Chairman Thomas's failure to recuse himself from the rulemaking docket was unfair in light of the record on appeal.

Here, Petit Jean argues that Thomas exhibited bias in the rulemaking docket by his communication with Toth on January 17, 2020. Petit Jean and other electric utilities, however, withdrew from the rulemaking docket on December 4, 2019, well before the telephone conversation that Petit Jean now claims constituted alleged witness tampering and bias.[21] In addition, Petit Jean fails to identify how the Chairman's conduct in the tariff docket exhibits a disqualifying bias against two-channel billing as a potential rate structure within the rulemaking docket. Within the tariff docket, Thomas exhibited poor judgment by engaging in this telephone communication. The Commission, however, rejected Petit Jean's proposed tariffs featuring two-channel billing in the tariff docket because they were

---

[21]Indeed, the notice declared that those utilities "will not have any witness appear at the hearing" in Phase 3, and instead, they "support[ed] the pre-filed comments that AECC has made in Phase [3]."

45

submitted prematurely, and Petit Jean has failed to show how the Chairman Thomas's poor judgment results in bias against the merits of two-channel billing in the rulemaking docket. Accordingly, for all of the foregoing reasons, we reject Petit Jean's argument.[22]

## C. Failure to Rule

Petit Jean next argues that reversal is warranted because the Commission issued Order No. 28 without first ruling as a whole on Petit Jean's motion to disqualify Chairman Thomas. According to Petit Jean, the chairman's statement declining to recuse himself was insufficient to resolve the matter of his disqualification from the rulemaking docket. Petit Jean particularly argues that Arkansas Code Annotated section 23-2-104, providing that "[t]he concurrence of two (2) members of the Arkansas Public Service Commission shall be necessary for commission action," required the entire Commission to rule on the motion to disqualify the chairman. We disagree.

We are not convinced that section 23-2-104 has any application here. It is merely a provision prescribing the minimum number of commissioners—or quorum—that must be present to take valid and legally binding action on behalf of the Commission. It does not address when—or how—a commissioner may be disqualified from taking such action.

---

[22]Petit Jean also argues that the chairman's alleged bias violated the Due Process Clause of the Fourteenth Amendment. Petit Jean raised its constitutional argument for the first time in its petition for rehearing; therefore, it is not preserved for appellate review. *See Consumer Utils. Rate Advoc. Grp. v. Ark. Pub. Serv. Comm'n*, 99 Ark. App. 228, 250, 258 S.W.3d 758, 775 (2007).

We have found no Arkansas law, either by statute or caselaw, that specifically addresses when or how a commissioner is disqualified. We are persuaded, however, by a Florida precedent that the request for a commissioner's disqualification is not a matter that is suited for public deliberation or action by the other commissioners. In *Biscayne Bay Pilots, Inc. v. Fla. Carribbean-Cruise Ass'n*, 160 So.3d 559, 562 (Fla. Dist. Ct. App. 2015), the cruise association, a group of cruise lines that operate in the Port of Miami, applied to a subcommittee of the Board of Pilot Commissioners for a reduction in pilotage rates. A group representing the harbor pilots filed a motion seeking the disqualification of two of the committee members because they were employees of cruise lines that were members of the cruise association. The committee, concluding that it did not have the authority to disqualify its members, denied the motion.

The Florida appellate court agreed that the committee lacked the authority. Noting that there was no guidance in Florida's statutes, rules, and caselaw, the court determined that allowing the individual committee members to rule on their respective motions to disqualify was better policy. The court explained as follows:

> [W]e see no reason for the [committee] to have any role in determining whether a motion to disqualify an individual member of the [committee] should be granted or denied. Instead, we think the better procedure is for that decision to be made by the individual himself or herself upon review of the legal sufficiency of a timely filed motion challenging the individual's "bias, prejudice, or interest." This procedure is analogous to the procedure followed by appellate judges when ruling on a motion to disqualify; the motion is ruled on by the judge to whom the motion is directed, not the collegial body on which the judge serves. [internal citation omitted] A procedure that allowed the [committee] to disqualify one of its members or overrule the member's decision not to disqualify himself or herself, would undermine collegiality

47

and could infuse politics, voting alliances, or other mischief into a decision that should be based solely on an assessment of the motion's legal sufficiency.

*Id.* at 563. So it could be here if Petit Jean has its way. Therefore, we reject Petit Jean's argument that the whole commission was required to determine whether Chairman Thomas should be disqualified from the rulemaking docket.

## C. Imputing the Chairman's Alleged Bias to the Entire Commission

Petit Jean next argues that Order Nos. 28 and 33 should be reversed because the chairman's alleged bias must be imputed to the remaining commissioners under the law. Petit Jean also suggests that the Commission's failure to act on the motion to disqualify Chairman Thomas, as argued in point 2, *supra*, is evidence of the commissioners' alleged bias.

Petit Jean failed to preserve this issue for appellate review. This court will not consider the merits of arguments raised for the first time in a petition for rehearing before the Commission, *see Consumer Utils. Rate Advoc. Grp.*, 99 Ark. App. at 250, 258 S.W.3d at 775, and Petit Jean did not previously seek the disqualification of the remaining commissioners or otherwise argue that the chairman's bias should be imputed to them. Accordingly, we decline to reach the merits of this issue.

## D. The Phase 3 NMRs as Pretext

In its final argument, Petit Jean asserts that Order No. 28 should be reversed because it is not supported by a reliable evidentiary record. Specifically, Petit Jean insists that the events in the tariff docket demonstrate that the Commission considered matters outside the

official record of the rulemaking docket—namely, the conversation between Chairman Thomas and Mr. Toth. We do not agree.

Once again, the tariff docket was not intended to address the merits of any of the alternative rate structures that Act 464 made available to the Commission. The Commission expressly reserved that issue for the rulemaking docket. The Commission opened the tariff docket to allow the immediate implementation of Act 464's less controversial provisions. Petit Jean repeatedly attempted to inject two-channel billing—one of the matters reserved for the rulemaking docket—into the tariff docket. Chairman Thomas's misplaced effort to urge Petit Jean's compliance with the Commission's orders in the tariff docket did not address the relative merits of two-channel billing or any of the other rate-structure options. Accordingly, the chairman's conversation was not a "matter outside of the official record" that renders the revised NMR's pretextual.

IV. *Conclusion*

We reverse the Commission's orders on the basis of Scenic Hill's arguments that the Commission exceeded its statutory authority. We also reject the arguments offered by AECC and Petit Jean because they are either not preserved or without merit.

Affirmed in part; reversed in part.

HARRISON, C.J., and GLADWIN, KLAPPENBACH, BARRETT, and BROWN, JJ., agree.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *John Keeling Baker*, for separate appellant Petit Jean Electric Cooperative Corporation.

*Lori L. Burrows*, Vice President and General Counsel, for separate appellant Arkansas Electric Cooperative Corporation.

*Keyes & Fox, LLP*, by: *Jason B. Keyes*; and *Kutak Rock LLP*, by: *Jess Askew III* and *Frederick H. Davis*, for separate appellant Scenic Hill Solar, LLC.

*Valerie F. Boyce*, Chief Administrative Law Judge, for separate appellee Arkansas Public Service Commission.

*Dover Dixon Horne PLLC*, by: *Randall L. Bynum* and *Adrienne M. Griffis*, for separate appellee Arkansas Advanced Energy Association, Inc.

*Noland Law Firm, P.A.*, by: *Ross Noland*, for separate appellee National Audubon Society, Inc.

*Richard Mays Law Firm PLLC*, by: *Richard H. Mays*, for separate appellee Sierra Club.